UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

KEVIN DANIELS,

Petitioner,

**OPINION & ORDER**
**07-CV-00448 (SJF)**

- against -

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent.

------------------------------------------------------------------X

FEUERSTEIN, J.

On January 11, 1996, a judgment of conviction was entered against petitioner Kevin Daniels ("Petitioner") in the Supreme Court of the State of New York, Kings County (Marrus, J.), upon a jury verdict finding him guilty of murder in the second degree, N.Y. Penal Law § 125.25(2), and burglary in the first degree, N.Y. Penal Law § 140.30(1), and upon imposition of sentence. On or about January 30, 2007, Petitioner filed the instant petition ("Petition") *pro se* seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

For the reasons set forth herein, the Petition is denied and the proceeding is dismissed.

I.    BACKGROUND

A.    Factual Background

The following facts were taken from the underlying trial transcript, (T.), sentencing minutes, (S.), and hearing transcript, (H.):

1

1.    <u>Suppression Hearing</u>

Petitioner moved to suppress: (1) "evidence that was obtained as a result of [an] illegal entry" into Petitioner's apartment, (H. 385); (2) statements resulting from "an illegal search and arrest," (H. 386); (3) the lineup because "the police [did not] use all tools that were available to them to obtain proper fillers," (H. 385); and (4) "any and all evidence arising from the arrest of [Petitioner]," (H. 387).

A hearing was held on November 16, 17, and 22, 1995 before New York State Judge Alan Marrus, at which Detective Joseph Guerra, (H. 7-36), Detective Robert Schulman ("Detective Schulman"), (H. 37-275), Detective Edward Horton, (H. 418-51), Brenda Andrews ("Andrews"), (H. 312-53), and Shaniek Banks ("Banks"), (H. 354-80), testified.


a.    <u>Detective Schulman's Testimony</u>

Detective Schulman testified that on the night of January 21, 1995, (H. 38), at approximately 11 p.m., (H. 201), he was assigned to the Housing Bureau's PSA-2 Detective Squad, responded to an incident at 265 Livonia Avenue, in Brooklyn, New York, (H. 201), and traveled to Brookdale Hospital and Kings County Hospital to attempt to interview shooting victims Lisa Todd ("Todd"), Richard King ("King"), Thomas Williams, and Ben Smalls, (H. 202, 204). On the morning of January 22, 1995, Detective Schulman received a telephone call from Derrick Hill ("Hill"), (H. 38-39, 205), a resident at 265 Livonia Avenue, who stated, *inter alia*, that Willie Smith ("Smith")[1] and Petitioner, "were involved in a shooting in the apartment the previous night, he had seen them in the hallway, [and] that both of them had guns," (H. 40).

---

[1] Willie Smith is also known as "Cook." (H. 42.)

Hill met with Detective Schulman on January 24, 1995, (H. 40), and told Schulman, *inter alia*, that he had seen Petitioner and Smith "in the hallway of the tenth floor of 265 Livonia . . . dressed in army fatigues . . . carrying guns," (H. 41). Petitioner and Smith demanded that Hill "clear out of the hallway because something was going to go down." (H. 41.) Shortly after Hill left the hallway, he heard "numerous gunshots . . . went to a stairwell between the ninth and the tenth floor, and . . . observed . . . [Petitioner] and [Smith] running down the stairs, removing some type of mask from their face, and both of them had guns," which Hill "described . . . as a .9 millimeter and . . . an AK-47." (H. 41.) Hill also told Detective Schulman that, on "January 18 of 1995, he was in Cook's house, referring to Willie Smith, in apartment 6A at 265 Livonia Avenue, and . . . saw an assault weapon, a shotgun, and a .9 millimeter handgun . . . [and on] January 23rd, 1995, at about eleven o'clock in the morning, he was in Cook's house again and saw an assault gun." (H. 42-43.)

On January 24, 1995, at approximately 7:45 p.m., Detective Schulman and accompanying officers executed a search warrant for Apartment 6A. (H. 44.) In addition, a plan was devised to "gain a consent search" of Michael Lemonier's ("Lemonier") apartment, 9G, and Petitioner's apartment, 8E, "since [they] had information that [Petitioner] was involved, he was a suspect in the shooting." (H. 53, 217-18, 223.)

After securing Apartment 6A, Detective Schulman proceeded to Apartment 8E where he noted that Petitioner's "apartment was opened and there [were] numerous civilians and police personnel in the hallway." (H. 226-27.) Detective Schulman spoke with Andrews, Petitioner's mother, in the hallway outside of Petitioner's apartment, (H. 227, 232), and informed her that they were "conducting an investigation regarding a shooting, that her son was a suspect in the

3

shooting at that time [and] that's why [they] were there at that apartment," (H. 232). Detective Schulman inquired whether "there was anybody else inside the apartment, because there were numerous civilians in the hallway at that time." (H. 46.) Andrews told Detective Schulman that "[Petitioner] was having a rap or a deejay session inside the apartment or his room, and she wasn't sure if anybody else was inside the apartment." (H. 46.) Detective Schulman then asked Andrews if "[they] could look inside the apartment for any additional persons" and "she acknowledged that [they] could go in." (H. 47.) Detective Schulman explained that "an entry and search team [would] enter the apartment and check for any additional persons." (H. 47.) "At that time[,] [Andrews] gave permission." (H. 47.) Detective Schulman testified that, to his knowledge, no other member of the police department entered the apartment in his presence prior to his conversation with Andrews. (H. 232-33.)

The entry and search team entered the premises and "[a] short time later they brought out one other individual," Jamar Smith ("Jamar"). (H. 47.) Detective Schulman testified that "prior to [Jamar] coming out . . . another individual, [Lemonier]" was removed from the apartment. (H. 47-48.) On cross-examination, Detective Schulman maintained that Petitioner was "voluntarily" in the hallway outside of his apartment upon Detective Schulman's arrival at Apartment 8E and at the time of Petitioner's arrest. (H. 233, 237-38.)

After Detective Schulman was "told that the apartment was clear and safe," (H. 48), he entered the apartment and requested "permission to search [Petitioner's] bedroom for any weapons or contraband from the shooting," (H. 48, 238-39). Detective Schulman recorded Andrews' consent on a "permission-type slip" which Detective Schulman testified that she "freely signed." (H. 48-49, 235-36, 238.) Detective Schulman also testified that, in contrast to

4

Andrews' and Banks' testimony, (H. 313, 318-19, 357), Andrews' permission to search her son's bedroom was not obtained through threatening measures employed by himself or any officer on his team, (H. 235-36, 238, 240), nor did Andrews, or any other occupant of Apartment 8E, faint or request medical assistance at any time throughout his investigation, (H. 230-31). On cross-examination, Detective Schulman stated that the "only thing [Andrews] had said was she had asked if [Petitioner's bedroom] was the only place [they] were going to search and [he] assured her that was the only room [they] were going to search." (H. 238-39.) Moreover, Detective Schulman testified that prior to asking Andrews for permission to search Petitioner's bedroom, "the only thing . . . removed was the two persons that the entry team had brought out, . . . no other property was removed at that time," (H. 48), and that the "search was contained to only [Petitioner's] bedroom," (H. 266), as he "assured [Andrews]," (H. 238-39), despite Andrews' testimony to the contrary, (H. 319, 345, 348).

Throughout the search of Petitioner's bedroom, Detective Schulman and accompanying officers recovered "one ammunition clip loaded with live rounds; . . . [seventy-six] live rounds of an unknown caliber; . . . seven .44 caliber rounds; . . . one .44 caliber hollow-point round . . . inside a white plastic bag; . . . one bandanna, which was tied in a knot, with a white design in it;" and "three green camouflage jackets." (H. 51-52, 129, 265-66.) Following the searches of apartments 6E, 8E, and 9G, at approximately 10:30 p.m., (H. 244-45), Petitioner was taken to the police station and "put in a holding cell," (H. 243). Detective Schulman "[m]ade sure everybody was separated, took the evidence that [he] selected, inventoried it and began [his] investigative steps from there." (H. 242-43.)

At the police station, Detective Schulman and his partner, Detective Gerard Fitzpatrick, "read" Petitioner his "*Miranda* warnings" from a card. (H. 74-75.) Detective Schulman testified that "[Petitioner's] response to each one of the questions was 'yes'," (H. 75), and Petitioner "signed the card," (H. 247). Detective Schulman also testified that, prior to this time, neither he, nor any other member of the Police Department, spoke with or attempted to speak with or interview Petitioner. (H. 74.)

Petitioner then made a statement, which Detective Schulman transcribed "word-for-word," and after "recording it by hand, [gave Petitioner] an opportunity to review the statement." (H. 75.) Petitioner did not make any changes or corrections, (H. 75-76), and signed "the left-hand margin of each page and at the bottom of the statement," (H. 76). Detective Schulman testified that "[Petitioner] was very willing to give a statement," and at no point in time did he "appear reluctant to make a statement, . . . [or] express anger or displeasure with what had taken place in front of his apartment." (H. 250.) On cross-examination, Detective Schulman denied "say[ing] anything to [Petitioner] to induce him to make a statement," (H. 249), or "promis[ing] him [anything] in return for his statement," (H. 247). Moreover, Detective Schulman denied telling Petitioner that "no one [would] put a gun on him and if he gave everybody up, he could walk out." (H. 247.)

After Petitioner gave his statement, (H. 250-51), Detective Schulman conducted three (3) separate lineups where Smith, Jamar, and Petitioner were the subjects, (H. 54). Petitioner chose position number four (4) in the lineup. (H. 57.) Detective Schulman "believe[d] [Petitioner was] nineteen-years-old," and testified that some of the fillers were "twice [Petitioner's] age" and approximately "fifty [to] sixty pounds heavier than [Petitioner]." (H. 252-53.) Detective

Schulman also testified on cross-examination that he dressed everyone in hospital gowns because "[n]ot everybody was wearing the same article of clothing and that's the format that [he] use[s] for all [his] lineups." (H. 253.) Hill identified Petitioner in the lineup and when Detective Schulman asked "where [he] recognize[d] the subject from," Hill stated that he recognized Petitioner from "265 Livonia Avenue . . . when [Petitioner] was running down the stairs with the gun." (H. 56-57.) Hill, who knew Petitioner prior to this incident, "was able to name [Petitioner] by name and provide other methods of identification to [Detective Schulman]" before identifying Petitioner in the lineup. (H. 252.)

That same day, at 6:15 p.m., Detective Schulman was "present" when Petitioner made a videotaped statement to members of the District Attorney's office. (H. 77-78.)

On January 23, 1995, King identified Petitioner in a loose stack of twenty-four (24) photographs during an interview conducted by Detective Schulman. (H. 103, 108.) The photographic array from which King identified Petitioner was not "preserved for the [pretrial suppression] hearing." (H. 256.) After presenting the photographs to King, "they were returned to the photo books." (H. 256.) Detective Schulman testified that Petitioner and Smith were not the only individuals "dressed in fatigues" or "civilian clothes" in the group of twenty-four (24) photographs presented to King, although he could not recall the exact number of fillers that were also wearing such clothing. (H. 257-59.)

On January 31, 1995, Detective Schulman spoke with Todd at Brookdale Hospital. (H. 86.) Detective Schulman testified that "[Todd] remembered what happened to her . . . that she got shot," that the people who shot her were dressed in "army fatigues," and "all lived in the building." (H. 87.) When asked whether she knew their names, "[Todd] said Kevin, he lives on

the eighth floor . . ." (H. 87.) On February 5, 1995, Detective Schulman returned to Brookdale Hospital where Todd provided additional information, (H. 87), including:

> "she was in that apartment at 265 Livonia . . . preparing to go to a party at her mother's house. While inside that apartment with some other friends a group of males burst into the apartment, armed with guns. They forced everybody down to the floor at gunpoint. They started to make people strip. They were searching through the apartment . . . after they did what they did in the apartment or had to do, they began to back out of the apartment, at which time they began shooting."

(H. 88-89.) Todd also identified Petitioner in a photographic array and informed Detective Schulman "that [Petitioner] was there and that he had a gun, but she could not remember if he [was] the one that shot her or not." (H. 98, 262-63.)


### b. The Defense

Andrews testified that on the night of January 24, 1995, she was in her apartment, 8E at 265 Livonia Avenue, when "[her] oldest daughter was leaving out [sic] the apartment and she says the officers was at [the] door [sic] and they ask for [her] and they ask for [her] son." (H. 313.) Contrary to Detective Schulman's testimony, (H. 47-49, 238), Andrews testified that she did not voluntarily consent to the search of her home that evening, (H. 318-19), but that "[the police] told [her] if [she] didn't let them search the apartment they would arrest [her] and [her] three daughters," (H. 313). Andrews also testified that she fainted "when officers handcuffed [her] son," (H. 316-17, 350), and that "[w]hen [she] was coming to [Detective Schulman] wrote on the paper [she] gave him permission to search [her] son's room," (H. 338). Andrews maintained that, although she signed the paper giving permission to search Petitioner's bedroom, she did not read the consent paper because "[she] was light-headed." (H. 338-39.)

8

Andrews testified that she consented because she was "nervous" as "the [police] threatened [her]." (H. 320, 339-40.) Contrary to Detective Schulman's testimony, (H. 230-31, 265-66), Andrews testified that Detective Schulman "ask[ed] [her] did [sic] [she] want to go to the hospital, [and she] told him no," (H. 317, 344), and "[the police] searched [her] girl's room, . . . [her] linen closet and [her] storage closet . . .", (H. 319).

Banks, Andrews' daughter, testified that when she "got to the door to leave [her] apartment," on the night of January 24, 1995, (H. 355), "cops [were] listening to the door," (H. 356), and "jump[ed] back" when she opened the door, (H. 363). Banks testified that "[the police] said they had a search warrant, but [she] didn't see no [sic] search warrant showing," and that police threatened that they would "get arrested, if they didn't [let them] search." (H. 357.) Banks stated that she "did not see [her] mother sign any kind of a piece of paper." (H. 359-60.) Banks also testified that when the police handcuffed Petitioner, "[Andrews] came out, . . . passed out . . . [and] [w]hen she . . . hit the ground, the cop ask [sic] her do you want medical attention." (H. 358.) Andrews did not indicate that she wanted medical attention so "[t]hey brought her back inside the house." (H. 358.)

Neither Andrews or Banks, (H. 348, 350, 366-67), disputed Detective Schulman's testimony that Petitioner was in the hallway outside the apartment when he was handcuffed, (H. 233, 237-38). However, Andrews testified that when "[police] told [her] to come to the door," Petitioner was "inside the apartment" and that "[w]hen they asked to talk to him[,] he came out of his room . . . ." (H. 336.)

c.    Hearing Court's Decision

By decision dated November 22, 1995, the hearing court denied Petitioner's motion to suppress the evidence obtained through the search of his apartment, his arrest, and the pretrial identification procedures from which witnesses identified Petitioner. (H. 397-403.) The hearing court concluded that Detective Schulman was a "credible" witness whose account "was not only clear and consistent but was documented throughout with forms and photographs and a videotape." (H. 397.) In contrast, the hearing court rejected the testimony of Andrews and Banks because, *inter alia*, their "accounts were inconsistent on key points, and even internally inconsistent on key points." (H. 397-98.)

The hearing court held that the arrest and custody of Petitioner was lawful because "[t]he police had probable cause," (H. 401), and noted that "[t]here [was] no testimony . . . that indicates [Petitioner] was arrested inside his premises," (H. 398-99). The hearing court also found that "Andrews approv[ed] a search of [Petitioner's] bedroom," (H. 399), that "[t]he physical evidence was seized after a search documented by a [signed] consent form," (H. 401), and, therefore, "all of the physical evidence that was seized is proper and . . . admissible at trial," (H. 401).

Moreover, the hearing court found that the "lineup . . . show[ed] no undue suggestiveness, and the nature of the way the lineup was conducted, how the police questioned the witnesses and arranged the lineup seem[ed] perfectly fair . . . [Petitioner] had his choice of where he wanted to be in the lineup, and there was nothing suggestive in that identification by the Police." (H. 401-02.) The hearing court also held that the photographic array which was preserved for judicial review was "a perfectly proper photographic array, . . . [with] nothing

10

suggestive about it," and the hearing court did not find anything "inherently suggestive" about the fact that "individuals had camouflage jackets on" in the "array that was not preserved." (H. 401.) The hearing court denied the motion to suppress the "statements made to both the police and the district attorney" as it was "clear [that Petitioner] was given the Miranda rights." (H. 402.)

2. The Trial

a. The People's Case

Detective Schulman's testimony at trial was consistent with his testimony at the pretrial suppression hearing. (T. 155-203, 424-90.) The People presented several additional witnesses:

Dr. Stephen DeRoux ("Dr. DeRoux"), a forensic pathologist employed by the City of New York, Office of the Chief Medical Examiner, (T. 98), performed an autopsy of Ronald Ellis ("Ellis") on January 24, 1995, (T. 101). Upon an external examination of Ellis' body, Dr. DeRoux discovered "multiple gunshot wounds of [Ellis'] extremities and his buttocks area, . . . a recent surgical incision of his right thigh, . . . a few abrasions on his face and neck," (T. 102), and "multiple fractures of the right femur," (T. 104). Dr. DeRoux also performed an internal examination where, "at the exit portion of [the] wound, in the front of the left thigh, . . . [he] recovered a portion of a bullet," (T. 112), and a "bullet fragment from the inner aspect of the right thigh," (T. 113-14). "There was also a . . . grazed gunshot wound of the back of the left calf area or leg, and there was a graze gunshot wound of the right wrist." (H. 104.) After conducting the autopsy, Dr. DeRoux concluded, with a reasonable degree of medical certainty, that Ellis's immediate cause of death "[was] cardiac arrest during open reduction and internal fixation of the

right femoral fracture due to multiple gunshot wounds of extremities resulting in hypervolaemic shock and myocardial invert." (T. 114-15.) Dr. DeRoux stated that Ellis "lost a large amount of blood, which made him go into shock . . . [this] decrease[d] the amount of blood going to his heart, which made a portion of his heart muscles die." (T. 115.) He also stated that "artherosclerotic and hypertensive cardiovascular disease and cocaine abuse" was a "secondary cause of death." (T. 116.) Dr. DeRoux testified on cross-examination that "[b]esides the fact that [Ellis] had evidence of high blood pressure and . . . coronary artery disease[,] he was in good physical condition." (T. 118.) On redirect examination, Dr. DeRoux testified that, in his medical opinion, Ellis would not have died "but for having been shot as many times as [he] was shot." (T. 137.)

Hill testified that on January 18, 1995, he "observed an AK-47, a shotgun, and a .9 [millimeter]" in Smith's bedroom. (T. 212-13.) On January 21, 1995, Hill saw Petitioner in the tenth floor hallway wearing "[c]amouflage" clothing and a "[c]loth bandanna . . . around [his] neck." (T. 223.) Hill also testified that he saw "[Petitioner] with a 9 . . . similar to the one [he] saw before." (T. 223-24.) Petitioner and Smith told Hill to "get out the hall" because "[s]omething was going to happen." (T. 224.) Hill testified that he "had an idea" of "what was going to happen at that time." (T. 224.) Hill complied, went to Apartment 10E, and then returned to Apartment 9E. (T. 225.) Approximately "ten minutes [later, Hill] heard between fifteen and twenty shots" fired "above" his apartment. (T. 225.) Hill "ran out [sic] the apartment," (T. 226), into the stairwell and saw Petitioner, wearing "[c]amouflage and a bandanna on his face," (T. 228), running down the stairs holding a "9," and "Cook running down

12

with the AK-47," (T. 228-29). On January 25, 1995, Hill went to the precinct and identified Petitioner in a lineup conducted by Detective Schulman. (T. 262-64, 276.)

King, who resided in Apartment 10C with Ellis in January of 1995, (T. 296-97), testified that he was in the apartment on January 21, 1995 "waiting for a package to come," (T. 298-99). When Ellis opened the front door to the apartment,

> "the first thing [King] saw was . . . [an] AK-47 coming through the door and about four or five other guys. They were dressed in khaki uniforms and scarfs or kerchiefs around their mouths and when they came through the door, the one with the . . . AK-47 said everybody strip their pants, clothes off and lay on the floor."

(T. 301.)

King also testified that Petitioner was in Apartment 10C on the night of January 21, 1995, (T. 305), "wearing the same things," (T. 305-06), "dressed in [a]rmy khakis, fatigues," (T. 303). "[W]hen [King] saw them come into the apartment" he was able to see "[a] little bit of . . . the top" of Petitioner's face. (T. 306.) Petitioner and Cook were "beating up on Mark . . . asking him where the merchandise was at." (T. 305.) Petitioner and Cook also "ask[ed] [King] where the stuff was at and [when he] told them there was nothing in the house . . . they started beating up on [him]." (T. 307.) King also testified that when "these people were backing out [of the apartment] . . . [he] heard a shot ring out and [he] heard somebody say 'I'm hit' then the next shot [he] heard . . . hit [him] in the back." (T. 315.) King recognized Petitioner's voice, (T. 307), and "was able to see [Petitioner's] eyes," (T. 306-07).

Todd testified that she was in Apartment 10C on the night of January 21, 1995, (T. 359), "to get Mark to go to the party" at her apartment, 10F, (T. 362), when five (5) or six (6) "guys came in with the guns," (T. 363). Todd stated that "[t]hey had on camouflage with masks." (T. 363.) Todd also testified that she did not see Petitioner inside Apartment 10C because "most of

them had their backs to [her]," (T. 365-66), but that she did see Petitioner "[come] up the hallway a minute before this happened," (T. 364), and "ask[ ] the guys to get out [of] the hallway," (T. 365). Todd stated that she had known Petitioner for "[a]bout five, six years" prior to January 1995. (T. 352-53.) Todd also testified that she saw Jamar, Quaran Frazier, Lemonier, and Jabbar Washington in Apartment 10C on January 21, 1995. (T. 366-68.) As "they was [sic] backing out . . . that's when the shooting just went off" and she was "shot . . . [a]ll over [her] body." (T. 375.)

Contrary to Andrews' testimony, (T. 662), Todd denied ever "tell[ing] Andrews that [Petitioner] had nothing to do with this case," (T. 380), or telling Petitioner that he had "nothing to worry about" because she would not "[p]lace him at the scene" of the crime, (T. 380-81).


b.  The Defense

Andrews testified that, after she fainted, "[w]hen [she] was coming to, [Detective Schulman] wrote something on a paper and told [her] to sign it. . . . He said it was a paper stating that [she] gave him permission to search [Petitioner's] room," (T. 659), and "[police officers] had told [her] if [she] don't [sic] let them search [her] apartment, they will padlock [her] apartment and lock [her] and [her] girls up," (T. 673). Andrews also testified that "[w]hen they handcuffed [Petitioner], that's when [she] passed out," (T. 673-74), and that police officers left "with something wrapped up [when] they went out the door," (T. 690), although she "[didn't] know what it was [because] . . . [i]t was wrapped up," (T. 694).

Contrary to Todd's testimony, (T. 380-81), Andrews testified that subsequent to the events that occurred in January 1995, "[Todd] knocked on [Andrews'] door," (T. 661), spoke to

14

Petitioner on the telephone and told him that "everything [would] be all right," (T. 662).
Andrews asked Todd "could you tell me the truth, was [Petitioner] involved upstairs. . . .
[Todd's] exact words were, . . . I don't know who it was, because they had on masks." (T. 662.)
On cross-examination, Andrews testified that she did not have prior knowledge that Todd was
going to be a witness in this case, (T. 713), and denied asking Todd not to testify against
Petitioner at trial, (T. 713-14).

Petitioner did not testify.


### 3. Verdict and Sentence

Following a jury trial, Petitioner was found guilty of murder in the second degree, N.Y.
Penal Law § 125.25(2), and burglary in the first degree, N.Y. Penal Law § 140.30(1). (T. 996-
97.) On January 11, 1996, Petitioner was adjudicated a second violent felony offender, (S. 5-6),
and sentenced to consecutive terms of imprisonment of twenty (20) years to life on the second
degree murder count, and ten (10) to twenty (20) years on the first degree burglary count, (S. 30),
and to a consecutive term of two-and-one-third (2 1/3) years to seven (7) years for a violation of
probation, for a total term of imprisonment of thirty-two-and-one-third (32 1/3) years to life, (S.
30-31).


### B. Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New
York, Appellate Division, Second Judicial Department, on the grounds that: (1) "the court
committed [r]eversible [e]rror by denying [Petitioner's] [m]otion to [s]uppress the [e]vidence

obtained as a [d]irect [r]esult of his [i]llegal [a]rrest;" (2) "[t]he court committed [r]eversible [e]rror by [d]enying [Petitioner's] [m]otion to [s]uppress the [e]vidence obtained as a [d]irect [r]esult of a [Payton v. New York, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)] violation, in that the [p]olice entry into [Petitioner's] home to arrest him without an arrest warrant is an [i]llegal, [u]nconstitutional [a]rrest;" (3) "the [c]ourt committed [r]eversible [e]rror by [d]enying [Petitioner's] motion to [s]uppress the [p]hysical [e]vidence obtained as a direct result of a Payton violation by holding that [Petitioner's] mother 'consented' to the search, when no such 'voluntary' consent was established;" (4) "the [c]ourt committed [r]eversible [e]rror by [d]epriving [Petitioner] of his [r]ight to Due Process (a) when the [h]earing [c]ourt [r]efused to [s]uppress the unduly suggestive line-up identification(s), where the age of the perpetrator figured prominently in the description given by the witness who viewed the lineup and (b) when the hearing [c]ourt refused to consider the totality of the circumstances surrounding the witness's identification of [Petitioner], and (c) where the photographic array was not preserved;" (5) "the Assistant District Attorney committed [r]eversible [e]rror and deprived [Petitioner] of a [f]air [t]rial by [i]mproper and [p]rejudiced comments in his summation;" and (6) "[Petitioner's] [s]entence should be [r]educed and [m]odified to minimum concurrent sentences based on the facts and laws of the case and in the interests of justice, due process, and equal protection." (App.'s Brief, attached as Ex. E to Aff. in Opp'n to the Pet. ("Resp't Aff."), pp. 1-3) (citations omitted).

By Order dated October 17, 2005, the Appellate Division Second Department affirmed Petitioner's judgment of conviction, finding, *inter alia*, that: (1) "the hearing court correctly refused to suppress the identification testimony of a witness who selected [Petitioner] from a

lineup, as the lineup was not unduly suggestive . . . ;" (2) "the court correctly refused to suppress certain physical evidence that the police seized during a warrantless search of [Petitioner's] bedroom, as [Petitioner's] mother, who had the authority to consent to the search . . . , voluntarily gave that consent;" (3) "[t]he court also correctly refused to suppress incriminating statements that [Petitioner] made to detectives soon after his arrest, as the arrest was supported by probable cause . . . , and was not in violation of Payton, 445 U.S. 573];" (4) "[t]he sentence imposed was not excessive . . . ;" and (5) "[Petitioner's] remaining contentions are either unpreserved for appellate review . . . or without merit." People v. Daniels, 22 A.D.3d 678, 679, 804 N.Y.S.2d 345 (N.Y. App. Div. 2d Dept. 2005) (citations omitted). On February 14, 2006, the New York Court of Appeals denied leave to appeal the Order of the Appellate Division. People v. Daniels, 6 N.Y.3d 811, 812 N.Y.S.2d 451 (2006).

On or about January 30, 2007, Petitioner filed the instant Petition alleging that his constitutional rights were violated when, *inter alia*: (1) "the [h]earing [c]ourt refused to suppress the unduly suggestive line-up identification" ("Ground One"); (2) the hearing court "refus[ed] [to consider] the [t]otality of the [c]ircumstances surrounding the [w]itness's [i]dentification [of Petitioner]" ("Ground Two"); (3) "the [p]olice . . . did not [p]erseve [sic] the [p]hotographic [a]rray or [s]pread for [j]udicial review creating an inference that the spread was [u]nduly [s]uggestive . . . " ("Ground Three"); (4) "the [s]ummation of the [p]rosecutor was replete with improper, inappropriate, prejudicial, and highly inflammatory" comments ("Ground Four"); (5) the hearing court refused to suppress the "[e]vidence obtained as an indirect result of the Fourth Amendment [v]iolation . . . [as such evidence] is inadmissible [as] 'Fruit of the Poisonous Tree'" ("Ground Five"); (6) "[t]he [p]olice entered into [Petitioner's] home without an arrest warrant . . .

17

did not see or encounter [Petitioner] at the doorway or near the hallway of [his] apartment . . . [and Petitioner] was removed from [his] home without an arrest warrant and without an [sic] search warrant" ("Ground Six"); (7) "the [h]earing [c]ourt should have suppressed the physical evidence" because "[t]here was [n]o [v]oluntary [c]onsent [t]o [s]earch" ("Ground Seven"); and (8) "[t]he court did not advise . . . [Petitioner] that [he] would be subjected to or exposed to a potential sentence of 32 1/3 years to life . . . " and because "the conviction was for essentially one incident at one place and time," Petitioner "should have not [sic] received a consecutive sentence but rather a concurrent sentence" ("Ground Eight"). (Pet. 6-22.) Respondent filed the return on or about June 22, 2007.

## II. DISCUSSION

### A. Pro Se Status

A *pro se* petitioner's submissions are held "to less stringent standards than formal pleadings drafted by lawyers . . . ." Hughes v. Rowe, 449 U.S. 5, 9, 101 S. Ct. 173, 66 L. Ed. 2d 163 (1980) (quoting Haines v. Kerner, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)). Thus, a court must "read the pleadings of a *pro se* plaintiff liberally and interpret them to raise the strongest arguments that they suggest." McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks and citations omitted). Nonetheless, a *pro se* petitioner is not "exempt . . . from compliance with relevant rules of procedural and substantive law." See Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983) (internal quotation marks and citations omitted).

B.     Exhaustion

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254,

governs applications of incarcerated state court defendants seeking federal habeas corpus relief.

The AEDPA requires that prior to bringing a petition for habeas corpus relief in federal court, a

petitioner must "exhaust the remedies available in state court or demonstrate that 'there is an

absence of available [s]tate corrective process [or that] circumstances exist that render such

process ineffective to protect the rights of the [petitioner].'" Fama v. Commissioner of Corr.

Servs., 235 F.3d 804, 808 (2d Cir. 2000) (citing 28 U.S.C. § 2254 (b)(1)).  To satisfy the

exhaustion requirement, a petitioner must "fairly present" both the factual and legal premises of

his federal claim to the highest state court.  Baldwin v. Reese, 541 U.S. 27, 32, 124 S. Ct. 1347,

158 L. Ed. 2d 64 (2004); see also McKinney v. Artuz, 326 F.3d 87, 96 (2d Cir. 2003) (stating that

"[t]o exhaust, the [P]etitioner must 'fairly present' his or her federal claims to the state courts,

meaning that he or she must put before the appropriate state court 'all of the essential factual

allegations'") (quoting Daye v. Attorney Gen. of State of New York, 696 F.2d 186, 191 (2d Cir.

1982) (en banc)).

While Respondent argued in its brief to the Appellate Division that Petitioner's

photographic array and prosecutor summation challenges were unpreserved,[2] these claims were

among Petitioner's "remaining contentions," which the Appellate Division found were "either

unpreserved for appellate review . . . or without merit."  Daniels, 804 N.Y.S.2d at 346 (citations

omitted).  Because the Appellate Division did not explicitly rely on a procedural default in

denying these claims, they are not precluded from federal habeas review.  See Fama, 235 F.3d at

---

[2] There is no dispute that the other claims asserted by Petitioner are fully exhausted.

810-11 (stating that "when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review" because "the state court has not adequately indicated that its judgment rests on a state procedural bar").

Accordingly, the standard of review under the AEDPA is applicable to all of Petitioner's claims.

C.     Standard of Review under the AEDPA

Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus that has met the procedural prerequisites

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d. Cir. 2007) (quoting Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)); see also Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006), cert. denied, 549 U.S. 1124, 127 S. Ct. 951, 166 L. Ed. 2d 725 (2007) (accord).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a

set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see also 28 U.S.C. § 2254 (d)(1). Alternatively, a federal habeas court may "'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (citing Williams, 529 U.S. at 413, 120 S. Ct. 1495). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S. Ct. 1495; see also Wiggins, 539 U.S. at 520-21, 123 S. Ct. 2527 (holding that the state court's decision must have been more than incorrect or erroneous; its application must have been "objectively unreasonable"). Under the AEDPA, "determination of [the] factual issue[s] made by a State court shall be presumed to be correct . . . [and] the applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254 (e)(1).

D.    Fourth Amendment[3]

In Stone v. Powell, 428 U.S. 465, 494, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his

---

[3] This section addresses Petitioner's claims asserted in Ground Five, Ground Six, and Ground Seven of the Petition.

21

trial." Under Stone, Fourth Amendment violations are generally not cognizable for federal habeas relief, *unless* the state has failed to provide the habeas petitioner "an opportunity for full and fair litigation of a Fourth Amendment claim." Wallace v. Kato, 549 U.S. 384, 395 n.5, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007).

Stone applies to all Fourth Amendment claims regardless of the nature of the evidence sought to be suppressed. See Cardwell v. Taylor, 461 U.S. 571, 573, 103 S. Ct. 2015, 76 L. Ed. 2d 333 (1983). Thus, identification evidence sought to be suppressed because it was obtained after an alleged illegal arrest will not be addressed by a federal habeas court if a petitioner had a "full and fair" opportunity to litigate his or her Fourth Amendment claim in state court. See id. at 572-73 (holding that Stone barred the petitioner's challenge to voluntary statements made while in custody following an alleged illegal arrest); see also Chavis v. Henderson, 638 F.2d 534, 538 (2d Cir. 1980) (holding that the district court appropriately rejected petitioner's claim that identification evidence obtained subsequent to an alleged illegal arrest should have been suppressed because petitioner's claim was already fully litigated in state court); Davis v. Warden, Clinton Corr. Facility, No. 99 Civ 4675, 2003 WL 23185752, at *12 (E.D.N.Y. Oct. 30, 2003) (holding that Stone barred the petitioner's claim that property seized during a search of his home should have been suppressed by the hearing court where it was alleged that the police illegally obtained his mother's consent to search because defendant was already provided a full and fair opportunity to litigate his Fourth Amendment claim in state court).

There are two situations in which a defendant is not provided a full and fair opportunity to litigate his or her Fourth Amendment claims and, thus, can maintain a Fourth Amendment claim on habeas review: "(a) if the state has provided no corrective procedures at all to redress the

22

alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2d Cir. 1992) (quoting Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1992) (en banc)).

Petitioner was provided a full and fair opportunity to redress his alleged Fourth Amendment violations by way of the pretrial suppression hearing held on November 16, 17, and 22, 1995. Petitioner's counsel had the opportunity to cross-examine the prosecution's witnesses and present evidence. Upon the denial of his motion to suppress, Petitioner was afforded the opportunity to appeal that decision to the Appellate Division, which also rejected Petitioner's claims, affirming the judgment of conviction. See Daniels, 22 A.D.3d at 678-79. The New York State Court of Appeals subsequently denied Petitioner leave to appeal. See Daniels, 6 N.Y.3d at 812. Because Petitioner has had a full and fair opportunity to litigate his claims as required by Stone, and has not shown a lack of state "corrective procedures" or an "unconscionable breakdown in the underlying process," Petitioner's Fourth Amendment claims are barred from federal habeas review. Capellan, 975 F.2d at 70; see Graham v. Costello, 299 F.3d 129, 134 (2d Cir. 2002) (stating that "once it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief").

Accordingly, habeas corpus relief is not warranted on these claims.[4]

---

[4] Insofar as Petitioner alleges that the pretrial identification evidence should also be suppressed under the Fourth Amendment, this claim is also foreclosed by Stone. Petitioner was afforded an opportunity to fully and fairly litigate these claims at the pretrial suppression hearing

E.    Pretrial Identification

Clearly established federal law at the time that Petitioner's conviction became final was

that a defendant's right to due process included the right not to be subjected to suggestive pretrial

identification procedures that create a "very substantial likelihood of irreparable

misidentification." Manson v. Brathwaite, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140

(1977) (citing Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247

(1968)); see also United States v. Douglas, 525 F.3d 225, 242 (2d Cir. 2008) (holding that a

defendant's right to due process includes the right not to be the subject of suggestive police

identification procedures that make an identification unreliable); Sales v. Harris, 675 F.2d 532,

537 (2d Cir. 1982) (holding that the Due Process Clause of the Fourteenth Amendment requires

the trial court "to exclude evidence which is so unreliable as to indicate a very substantial

likelihood of irreparable misidentification") (internal quotation marks and citations omitted).

In order to determine the admissibility of a pretrial identification procedure, the court must

first ascertain whether the procedures employed were "unnecessarily suggestive" of the

defendant's guilt considering the "totality of the circumstances" surrounding the identification.

Stovall v. Denno, 388 U.S. 293, 301-02, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), overruled on

other grounds by Griffith v. Kentucky, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987); see

Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001). "If the [pretrial identification] procedures

were not suggestive, the identification evidence presents no due process obstacle to admissibility;

. . . no further inquiry by the court is required, and '[t]he reliability of properly admitted

---

and on appeal. See Gray v. Ercole, No. 08 Civ 3300, 2008 WL 5082868, at *3 (E.D.N.Y. Nov. 25, 2008).

eyewitness identification . . . is a matter for the jury.'" Raheem, 257 F.3d at 133 (quoting Foster v. California, 394 U.S. 440, 442 n.2, 89 S. Ct. 1127, 22 L. Ed. 2d 402 (1969)). However, if the pretrial identification procedure was unnecessarily suggestive, the degree of suggestiveness must be balanced against factors indicating that the identification was independently reliable, including the following: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, 432 U.S. at 114, 97 S. Ct. 2243.

"A lineup is unduly suggestive as to a given defendant if he meets the description of the perpetrator previously given by the witness and the other lineup participants obviously do not." Raheem, 257 F.3d at 134. However, unnecessary suggestiveness does not, in and of itself, violate due process. See Neil v. Biggers, 409 U.S. 188, 198-99, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). Rather, in determining the admissibility of identification testimony, "reliability is the linchpin." Manson, 432 U.S. at 114, 97 S. Ct. 2243. Whether such evidence is admissible where the identification procedure was suggestive depends on whether, under the "totality of the circumstances," the identification was nevertheless reliable. Neil, 409 U.S. at 199, 93 S. Ct. 375. "In sum, the identification evidence will be admissible if (a) the procedures were not suggestive or (b) the identification has independent reliability." Raheem, 257 F.3d at 133 (citations omitted).

1.    The Lineup[5]

_____

[5] This section addresses Petitioner's claims asserted in Ground One and Ground Two of the Petition.

Petitioner claims that he was "[d]eprived his [d]ue [p]rocess right[s] under the [Fourteenth] Amendment by not [s]uppressing the [u]nduly [s]uggestive [l]ine-up," (Pet. 6), and "by [r]efusing [to consider] the [t]otality of the [c]ircumstances [s]urrounding the [w]itness's [i]dentification," (Pet. 8). At the suppression hearing, the hearing court found, *inter alia*, that the "lineup . . . showe[ed] no undue suggestiveness." (H. 401.) The hearing court, therefore, denied Petitioner's motion to suppress the lineup conducted by Detective Schulman, (H. 402), and the Appellate Division affirmed that determination, see Daniels, 22 A.D.3d at 678-79.

The lineup conducted by Detective Schulman from which Hill identified Petitioner did not create a "very substantial likelihood of irreparable misidentification" as proscribed by Manson. 432 U.S. at 116, 97 S. Ct. 2243. The photograph of the lineup reveals no hint of suggestiveness because, *inter alia*, Petitioner was not the only participant in the lineup who met the description of the perpetrator previously given by the witness. (Lineup photograph, attached as Ex. G to Resp't Aff. ("Ex. G.").) Although some of the fillers were older and heavier than Petitioner, (H. 252-53), Petitioner did not so obviously stand out from the lineup fillers so as to create a substantial likelihood of misidentification. See, e.g., Hartley v. Senkowski, No. Civ 90 0395, 1992 WL 58766, at *3 (E.D.N.Y. Mar.18, 1992) (rejecting petitioner's claim that the pretrial lineup was unduly suggestive where the fillers "appeared to be several years older" because in actuality, "all participants *appear[ed]* to be of approximately the same age, height, weight and coloring") (emphasis added). All of the lineup participants had similar skin tones, wore hospital gowns and head coverings, and were seated to minimize any significant differences in stature. (Ex. G.) In addition, Petitioner chose his position in the lineup. (H. 57.) Thus, the state court's determination that the lineup procedure was not unduly suggestive is not "contrary to, or . . . an unreasonable

application of clearly established Federal law," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d); see, e.g., United States ex rel. Richards v. Bartlett, No. Civ 92 2448, 1993 WL 372267, at *5 (E.D.N.Y. Sept 9, 1993) (finding that the state court's determination that the lineup identification was not unnecessarily suggestive was reasonable where the petitioner and all of the fillers were of similar height and age and the prosecutor took measures to make the fillers' appearances more similar to that of petitioner).

Given the lack of any suggestiveness in the lineup conducted by Detective Schulman, the identification evidence obtained from the lineup was admissible at trial "without further inquiry into the reliability of the pretrial identification[s]" of Petitioner. Douglas, 525 F.3d at 243 (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 973 (2d Cir. 1990)). Thus, the trial court's failure to inquire into the factors indicating the reliability of the lineup procedure or consider the "totality of the circumstances" surrounding Petitioner's identification, is not "contrary to, or . . . an unreasonable application of clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d).

Accordingly, habeas corpus relief is not warranted on these claims.


2.    Photographic Arrays[6]

---

[6] This section addresses Petitioner's claims asserted in Ground Two and Ground Three of the Petition.

Petitioner contends, *inter alia*, that he was "[d]eprived his [Fourteenth] Constitutional Amendment [r]ight to Due Process by [n]ot [p]erserving [sic] the [p]hotographic [a]rray . . . for [j]udicial review creating an inference that the spread was [u]nduly [s]uggestive." (Pet 9.) The hearing court held that the photographic arrays from which Todd and King identified Petitioner were not unduly suggestive. (H. 401-02). The hearing court denied Petitioner's motion to suppress the identification evidence obtained from the photographic arrays presented to witnesses, (H. 402), and the Appellate Division affirmed that determination, see Daniels, 22 A.D.3d at 678-79.

The photographic arrays did not create a "very substantial likelihood of irreparable misidentification" as proscribed by Manson. 432 U.S. at 116, 97 S. Ct. 2243. The photographic arrays presented to King and Todd reveal no hint of suggestiveness because, *inter alia*, Petitioner was not the only individual depicted in the photographic arrays who met the description of the perpetrator previously given by the witnesses. (Ex. G.) Petitioner complains that he was depicted "wearing the [c]amouflage [j]acket that was allegedly worn by the perpetrators in this case." (Pet. 9.) However, Detective Schulman testified that Petitioner was not the only individual "dressed in fatigues" or "civilian clothes" in the group of twenty-four (24) photographs presented to King, (H. 257-59), which was not preserved for the suppression hearing, (H. 256). The hearing court properly found that simply because "certain . . . individuals had camouflage jackets on" did not render the photographic array "inherently suggestive," (H. 401), and that the photographic array which was preserved for judicial review was "a perfectly proper photographic array, . . . [with] nothing suggestive about it," (H. 401). In sum, Petitioner did not so obviously stand out from the fillers in the photographic arrays so as to create a substantial likelihood of misidentification.

Moreover, even though Petitioner and Smith wore "scarfs or kerchiefs around their mouths," (T. 301), both Todd and King had an independent basis to identify Petitioner since Todd knew Petitioner for five (5) or six (6) years prior to January 1995, (T. 352-53), and King, a resident of the apartment at 265 Livonia Avenue, (T. 296-97), was able to see "[a] little bit of . . . the top" of Petitioner's face when Petitioner came into the apartment, (T. 306), and recognized Petitioner's voice, (T. 307), and eyes, (T. 306-07). Thus, the state court's determination that the photographic arrays were not unduly suggestive of Petitioner's guilt is not "contrary to, or . . . an unreasonable application of clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d).

Given the lack of any suggestiveness in the photographic arrays, the evidence obtained from the photographic arrays from which Petitioner was identified were admissible at trial "without further inquiry into the reliability of the pretrial identification[s]" of Petitioner. Douglas, 525 F.3d at 243 (quoting Maldonado-Rivera, 922 F.2d at 973). Thus, the state court's failure to inquire into the factors indicating the reliability of the identification procedures or consider the "totality of the circumstances" surrounding Petitioner's identification is not "contrary to, or . . . an unreasonable application of clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d).

Accordingly, habeas corpus relief is not warranted on these claims.

F.    Prosecutor's Summation[7]

Petitioner asserts that "[he] was [d]eprived his [United States] Constitutional [r]ight of a [f]air [t]rial" because, *inter alia*: (1) "[t]he [s]ummation of the Prosecutor was replete with improper, inappropriate, prejudicial, and highly inflammatory . . . comments, . . . such as 'Guilty by Association'. . . ;" (2) the Prosecutor "repeatedly departed and deviated from the actual evidence with blatant and prejudicial appeals to the jury's emotions . . .;" and (3) the Prosecutor "went as far to vouch for his witnesses, exaggerated and prevatcated [sic] and also repeatly [sic] got carried away with himself." (Pet. 11.)

Generally, a prosecutor's misconduct will require reversal of a state court conviction only where his or her remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). "[I]n order to be entitled to habeas relief, [a petitioner] must demonstrate that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994). "In assessing whether this standard has been met, it is relevant to consider a host of factors which include: (1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." Id. (citing Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991)).

---

[7] This section addresses Petitioner's claim asserted in Ground Four of the Petition.

None of the challenged comments by the Prosecutor during summation so infected the trial with unfairness as to make the resulting conviction a denial of due process, see Darden, 477 U.S. at 181-82; Donnelly, 416 U.S. at 643, nor is there any indication that Petitioner "suffered actual prejudice because the prosecutor's comments during . . . summation had a substantial and injurious effect or influence in determining the jury's verdict." Hudgins v. New York, No. 07 Civ 01862, 2009 WL 1703266, at *10 (E.D.N.Y. June 18, 2009) (citing Bentley, 41 F.3d at 824) (internal quotation marks omitted).

A review of the record indicates that there is overwhelming evidence to support Petitioner's conviction absent any of the challenged comments by the Prosecutor during summation. See Hudgins, 2009 WL 1703266, at *10-11; see also Darden, 477 U.S. at 181-82 (finding that no deprivation of a fair trial resulted from alleged prosecutorial misconduct where "[t]he prosecutors' argument did not manipulate or misstate the evidence, . . . implicate other specific rights of the accused . . . " and "[t]he weight of the evidence against petitioner was heavy . . . to support a finding of guilt on all charges . . . reduc[ing] the likelihood that the jury's decision was influenced by [the closing] argument"). In addition, during the jury charge, the trial court instructed the jury, *inter alia*, that the evidence consisted solely of the "testimony of the witnesses, . . . physical exhibits, . . . [a]nd . . . the stipulations by the attorneys." (T. 824-25.) With respect to counsels' summations, the trial court stated:

> "Now, you are not obligated to accept any of the arguments made by the attorneys in their summations, but if you find that any of the arguments made by them were reasonable, logical and consistent with the evidence as you remember it, then you may consider those arguments your own. On the other hand, if you find that any of the arguments made by any of the attorneys were not reasonable, not logical, not consistent with the evidence as you remember it, you [sic] then you may reject it entirely."

31

(T. 823-24.)

To the extent that Petitioner alleges that the Prosecutor "vouch[ed] for his witnesses," (Pet. 11), this is not supported by the record. While a prosecutor may not vouch for the credibility of a witness, he may address comments that challenge the credibility of government officials or undermine the validity of his case. See United States v. Thai, 29 F.3d 785, 807 (2d Cir. 1994) (citations omitted); see also United States v. Praetorius, 622 F.2d 1054, 1060-61 (2d Cir. 1979).

Accordingly, habeas corpus relief is not warranted on this claim.

G.    Sentence[8]

To evaluate claims of excessive sentence, the Supreme Court has articulated a principle of "gross disproportionality," which finds unconstitutional under the Eighth Amendment only extreme sentences that are grossly disproportionate to the crimes for which they are imposed. See Harmelin v. Michigan, 501 U.S. 957, 996-97, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991); Solem v. Helm, 463 U.S. 277, 283, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983); Rummel v. Estelle, 445 U.S. 263, 285, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980). Federal courts reviewing sentences imposed by state courts on habeas corpus review "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." Solem, 463 U.S. at 290, 103 S. Ct. 3001. The "gross disproportionality" principle finds sentences disproportionate to their crimes "only in the exceedingly rare and extreme case" and is reserved "for only the extraordinary case." Lockyer v. Andrade, 538 U.S. 63, 73-77, 123 S. Ct. 1166, 155

---

[8] This section addresses Petitioner's claim asserted in Ground Eight of the Petition.

32

L. Ed. 2d 144 (2003) (internal quotation marks and citations omitted); see also United States v. Snype, 441 F.3d 119, 152 (2d Cir. 2006) (noting that successful challenges to the proportionality of particular sentences have been exceedingly rare).

Petitioner contends, *inter alia*, that "[he] should have not [sic] received a consecutive sentence but rather a concurrent sentence" because "the conviction was for essentially one incident at one place and time." (Pet. 22.) However, under New York Penal Law, a consecutive sentence is permissible where, as here, the crimes charged (the first degree burglary and the second degree murder) are two (2) separate and distinct acts. See N.Y. Penal Law § 70.25; People v. Walsh, 44 N.Y.2d 631, 635, 407 N.Y.S.2d 472 (1978) (stating that "[c]onsecutive sentences are authorized where the crimes charged are not the result of a single act, but instead emanate from separate successive acts") (internal quotation marks and citations omitted). Moreover, Petitioner was sentenced within the statutory range prescribed by New York Penal Law, see N.Y. Penal Law § 70.00(2)-(3), (6), and it is well established that "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (citing Underwood v. Kelly, 692 F. Supp. 146, 152 (E.D.N.Y. 1988)); see, e.g., Freeman v. Burge, No. 05 Civ 1585, 2009 WL 1468464, at *15 (E.D.N.Y. May 22, 2009) (noting that a sentence which falls within the bounds of a state's sentencing statutes does not present a constitutional issue, and therefore cannot be reviewed by a habeas court) (citations omitted); see United States v. Wiley, 519 F.2d 1348, 1351 (2d Cir. 1975) (rejecting appellant's challenge to the length and nature of her sentence where it "was well within the statutory limits and was fixed within the sound judgment of the district court"); see also United States v. Gonzalez, 922 F.2d 1044, 1053 (2d Cir. 1991) (holding that courts should review the

disproportionality of sentences only in rare cases because the legislature's fixing of terms for imprisonment is "presumptively valid").

Petitioner also complains, *inter alia*, that "prior to the start of the trial . . . [he] was offered a plea bargain which would have procured an indeterminate term of 15 [y]ears to life on the murder charge" and "the court did not advise [him] that [he] would be subjected to or exposed to a potential sentence of 32 1/3 years to life that the court ultimately imposed." (Pet. 21.) However, the disparity between Petitioner's pretrial offer and his eventual sentence does not raise a constitutional issue. See Alabama v. Smith, 490 U.S. 794, 802, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989) (citations omitted).

Moreover, contrary to Petitioner's contentions, a disparity between Petitioner's sentence and that of his co-defendants does not give rise to a constitutional claim. See Williams v. Illinois, 399 U.S. 235, 243, 90 S. Ct. 2018, 26 L. Ed. 2d 586 (1970) (stating that "[t]he Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences"). Petitioner's sentence reflects, *inter alia*, his criminal conduct and criminal history. In addition, the disparity between the sentence imposed on Petitioner and that of his co-defendants who pled guilty is attributable to, *inter alia*, leniency in exchange for their guilty pleas. See Corbitt v. New Jersey, 439 U.S. 212, 220-21, 226, 99 S. Ct. 492, 58 L. Ed. 2d 466 (1978).

Despite Petitioner's contentions to the contrary, the sentencing court exercised some degree of leniency when it sentenced Petitioner to twenty (20) years to life imprisonment for the second degree murder conviction as the maximum sentence the sentencing court could have imposed was twenty-five (25) years to life. See N.Y. Penal Law § 70.00 (2)(a); 70.00(3)(a)(I).

The sentencing court also exercised leniency when it sentenced Petitioner to ten (10) to twelve (12) years of imprisonment for the first degree burglary conviction as the sentencing court could have imposed a sentence of eight (8) to twenty-five (25) years since Petitioner was adjudicated a second violent felony offender. See N.Y. Penal Law § 70.00 (2)(a); 70.00 (3)(a)(I); 70.06 (6)(a).

Thus, the sentence imposed is not "contrary to, or . . . an unreasonable application of clearly established Federal law," see 28 U.S.C. § 2254(d); see also Harmelin, 501 U.S. at 996-97, 111 S. Ct. 2680; Solem, 463 U.S. at 283, 103 S. Ct. 3001; Rummel, 445 U.S. at 285, 100 S. Ct. 1133, or based upon an "unreasonable determination of the facts in light of the evidence presented." See 28 U.S.C. § 2254(d).

Accordingly, habeas corpus relief is not warranted on this claim.

III.  CONCLUSION

The Petition for a writ of habeas corpus is hereby DENIED in its entirety and the proceeding is dismissed. As Petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253 (c)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253. The Clerk of the Court is directed to service notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to the *pro se* Petitioner at his last known address, see Fed. R. Civ. P. 5(b)(2)(C).

The Clerk of the Court is directed to close.


**SO ORDERED.**

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: August 21, 2009
Central Islip, New York